Ellen Green, on behalf of the Defendant Appellant, Cross Appellee, Country Life Insurance Company David Clevatte, on behalf of the Plaintiff and Appellee and Cross Appellant, Katherine Powell, for standing. Thank you. Could the lawyers who are going to argue this case stay with us for a second, please? Okay. First, I'd like to just remind you that these microphones do not amplify. They only record. So we ask you to keep your voice at a pretty high level so the people in the back of you can hear so that we can hear what's going on. Second, we don't have another case today, so it will last one time. But I would just remind you that we've already read the briefs and we're familiar with this case. So to the extent that you could sort of move along, that would be great. How much time do you think the appellant will need and how much do you plan to reserve? Well, is it taking 15? Well, if it's going to take, I don't know, 24 of an intent for the rebuttal. Okay. Okay. Let's try and keep the whole thing under 20, 25, somewhere in there maybe. I think 15 might be enough. Yeah. That'd be good. Thank you. Thank you for seeing me, Your Honor. Although, I just wanted to alert the panel that Mr. Howell and I have divided the labor. I don't know whether you want us both at the council table hopping back and forth. Not at all. One at a time is fine. We promise to keep you straight. Thank you. All right. Appellant, please start. I'll just take five minutes. Okay. No problem. Thank you. May it please the court. We're appealing the trial court's judgment that was entered after a bench trial in which it awarded the plaintiff $700,000 and over $300,000 in prejudgment interest. But we first have to emphasize that this is a breach of contract action with the issue in the trial court just simply being whether country life breached an obligation to pay under a life insurance policy. And this was a two-part question. The first part was whether the plaintiff demonstrated that she was entitled to benefits under the first instance. And the second issue was whether a suicide provision in the policy applied. If the judgment is against the manifest word of the evidence on either one of these grounds, the judgment for the plaintiff cannot stand. Now, as to the first issue, the trial court erred in equating due proof of death with notice of death, and in finding that the plaintiff met her burden in this regard. The insuring agreement in the country life policy is very clear. It says we agree to pay the first value amount to the beneficiary when we receive due proof that the insured step occurred while this policy was in full force. There's also a section of the insurance code, 224. It requires the policy to contain the provision that the settlement of claims shall be made upon, quote, receipt of due proof of death. So that is due proof. The Illinois courts, and we've established some cases in our groups, that interpreted due proof as a statement of facts reasonably verifiable as if established in court, the prima facie require payment of the claim. The administrative code, which contains the insurance regulations, it defines due proof as, quote, sufficient evidence to establish in court a prima facie case for payment of a claim. Now, at the time of the breach of contract... What does it mean, sufficient evidence? What do those words mean? Is it sufficient? In this case, we really don't have to hit that drum because there was no evidence of proof provided. But sufficient would just be to establish the fact of death, and that, in this case, would be depending on the standard that the courts apply, either the preponderance of the evidence or by a clear and convincing standard. Would you say that what... I'm sorry. If there was initial burden on her part, we would take providing for the evidence. What she did provide was not sufficient. She didn't provide anything. Well, her agent provided information. He provided information. It was a phone call. All that Country Life received was a phone call from a manager of an insurance agency, which was a Country Life agency. He had gotten information from an insurance agent, Will Aspinock, who got the information from his wife, who then got the information in a phone call from the point that it was sort of a telephone chain. So upon receiving this phone call, Country Life, at the same time that they received notice, through a phone call, they were informed that the death was a suicide. So in response to that, they sent a letter asking for information. But that's how they had it at the time the suit was filed. Okay. Can I just ask one more thing? Bill Asimakopoulos was the agent and also the family friend that signed the insurance policy. Jeffrey Orman is the gentleman you're talking about. Bill Asimakopoulos told Jeffrey Orman, oh, my friend John Sickless died. And then he, Mr. Orman, filed this death claim notification worksheet that we have in the file, plaintiff's exhibit 8. And did the insurance company of any reason believe that Bill Asimakopoulos was lying about his friend being dead? No, Your Honor. But it was just, do you really think that Mr. Orman would submit a wrong form? Your Honor, it's just notice. It's not sworn testimony, and it's based on a hearsay statement that came from someone else. We don't know what the original source is in this case. Looking back in retrospect, you could say, oh, now that we know that he's dead, if an insurance agent gets a phone call that somebody died and said, this is the information I have and provides it to the insurance company. Was there also in the record something from, I forget if it was Mr. Orman's boss or from Mr. Orman or some other person at the insurance company that told Asimakopoulos to provide documents? As of February 21, 2012, too, Bill Asimakopoulos. From Barb Dirks. Yes. Bill, please extend our sympathy, blah, blah, blah. Yes. Please provide these documents. So if I saw this, I would think that it was Bill's problem to get the documents. Your Honor, the last bullet, yeah, initially this initial response was sent to the insurance agent. And then after that, and this was the very next exhibit, that was the exhibit 32, exhibit 33, which is also in the record at E106. That's dated March 27. That's this letter is directed to the plaintiff. Right. But in the meantime, her friend, an agent, has been told by his company, gather these documents, and he apparently hasn't done any of it. That agent is the agent of the insurance company, not her agent. There is not proof as to whose agent it was, but it's not the burden of the agent as the insurance company. It's not the burden of the insurance company to provide proof of death. Where in the policy does it say that she has to provide these specific documents? In the policy. It's in the insurance agreement, due proof of death. That's just a very, it's a generic phrase. It is a generic phrase, but it leaves it open that maybe it's not limited to only on the social side. The insurance company writes the policy. If the insurance company wants a death certificate, they can certainly say due proof of death, including death certificate, autopsy report if available, if necessary, blah, blah, blah. The insurance company writes the policy. They didn't do that. They just said due proof of death. Unless it's sort of flying out there in the ether. What is that? It's not in the policy. It may be in the letters to the plaintiff from the insurance company, but it is not in the policy. So when she's writing the policy, sort of paying that money, the insurance company is perfectly happy to take that money and keep it, but they never gave her any specific warning that, oh, if something happens, here's your specific responsibility. Proof of death equals death certificate. And my other question is, in the policy, is there any clause that I missed that says, oh, and by the way, you are also agreeing to provide us with these specific forms? Anywhere in the policy? Your Honor, this was something that's subject to judicial interpretations. There's a contract here. The insurance company writes the contract. We're figuring out what is the language of the contract, and the contract doesn't say once in the pen about a death certificate. It's not anywhere in the policy. It does not define due proof of death, but that leaves it open to being satisfied by many different forms. Anything that would be sufficient in a court of law to establish that somebody died. What if there was an instance that somebody didn't have an official death certificate for whatever reason, but they had sworn testimony from witnesses that saw, yeah, I saw him, you know, this guy, he was murdered, and they had, you know, something in a court of law that they could establish the fact. It's not in the insurance company's control. They have the opportunity to define their terms, and if they do, fine. And if they don't, then why should we insert terms for them? Yeah, this is the language that's been used for maybe 100 years. Well, maybe the language that's been used, but that doesn't mean that it's the right language, and it doesn't mean that the policy as written by the insurance company gives the insurer everything that she needs to know about what she's supposed to do. Well, she was informed of what she was supposed to do in a letter. A letter is not the policy. I'm talking about the policy itself. Okay, she was not a party to the policy. She was a beneficiary. Yes, she was a beneficiary. But this is just common insurance company practice that... Counsel. Yes, please. We're talking about a policy, not common practice. We're talking about a policy. What is the contract? The contract does not, in this case, Country Life did not choose to limit the proof that's required to prove that by saying that we're only going to take in the first 15 minutes. They didn't have to limit it. They could have listed 15 things. It doesn't make any difference to me what they list. I just think they should have listed it if they wanted it. But that doesn't mean that this agreement doesn't mean anything. Well, it means that she was not under any obligation to perform some murky requirement. There was a finding that this language was ambiguous, and this language has been construed proof of that in other cases, including the 1925 Supreme Court case that we cited, the Senate case, where they said that oral notice was not sufficient to establish due proof of death. There was another case, Winkle Feltz, also. It was somebody's observation. They saw somebody fall into the river, but they didn't provide, you know, written proof of what was required to establish due proof of death. But even if it's not specified, in this case it's undisputed that she didn't provide anything, even though requests were made to her every month as required by insurance regulations to follow up on the claim. And she was notified once a month, you know, in order to be going through this claims process, we need this information, including like a death certificate, an authorization for medical records. But she didn't respond at all, and her excuse for not supplying was, I was a grieving widow. Well, the countrywide policy, it's a life insurance policy. There's always going to be a beneficiary that's grieving the death of an insurer, but that doesn't excuse them from providing due proof of death, which can be as simple as sending an official death certificate, but she admitted she already had in her possession. And we have a very sympathetic point of view that it's not a reason to disregard the language in the insuring agreement that we do not, we pay a time receipt of due proof of death. Otherwise, the policy is essentially meaningless. Anybody could just pick up the phone, call the insurance company and say, oh, my husband died. Okay. There has to be much of that, but it just can't even operate as a business. We don't even know what due proof of death is in two ways. First, you mentioned the precedent, Illinois Supreme Court cases going back to the 1920s. That's one way we know what the definition is, and it has to be sufficient to be prima facie proof in the court of law, right? Yes, and there's also an administrative regulation. And there's an administrative regulation in Part 1405. That's trying to prove in the same way that's, as I quote it, quote, sufficient evidence to establish in court a prima facie case for payment of a claim. Now, these regulations and the statutes are considered read into the policy language in the same way that the pre-judgment interest statutes is also read into the policy. And that's, you know, if you read a policy in a different way, that we're going to pay 9% interest. But the charge board here, it looked outside the plain language of the policy, and it looked to the statute to determine how to calculate any interest that was owed. So the fact that there was no due proof of death here, that's the end of the story. You win. We should. And then we have to still address their counterfeit. Oh, let me just add something. Their cross-appeal on the claim. Actually, you don't need to address the cross-appeal because their cross-appeal relates, well, it relates to some evidentiary issues or some conditional cross-appeal. You wanted to amend the complaint. It offered to, right, but I think essentially it would be moot. But that would be the remaining issue as to whether the trial court abused its discretion in denying them leave to amend to add a section 155 claim right before trial, even though they had withdrawn it two years earlier. And the country has actually did obtain the death certificate, correct? Yes, but it wasn't until after suit was filed. So I think suit was filed maybe April 2013, about a year after the February 2012 was what we're using as a date of death of February 2nd. We asked for information once a month until that time that you filed suit. After that suit was filed, then Country Life did obtain a copy of the death certificate, and if you look to the exhibit that was attached to the counterclaim, the date of the death certificate that was issued that we got was June 2013. So there's nothing to show that we already had that in possession beforehand, and it wasn't their obligation to go look for proof when, you know, that's something we just had to receive due proof of death. It's not the obligation of the insurance company to go out and prove that somebody died when somebody's making an insurance claim. But that was after the fact, so, you know, at the time, they didn't have anything on which to pay the persons, so they couldn't have breached their contract. This is a good question. The death certificate has the word suicide on it? Yes, it does. And it's in the lower left hand, right under the paragraph. Yes, Your Honor, and we believe that's why she did not want to submit a copy of the death certificate. I just want to clarify. The autopsy lists the manner of death as suicide? I don't know that that's in the autopsy. In the autopsy, I know they say that the wounds are consistent. I just want to make sure I understand this. Cause of death is what caused the death, a bullet, a train, a car falling from a roof. That's the cause of death. Manner of death would be the choices, as I understand it, are accident, suicide, homicide, unknown. Did the medical examiner ever determine the manner of death? I don't know that that was her, that that was a conclusion. It may have been in her records, but not admitted into evidence. I can't tell you for certain, but the actual certificate of death that's in the record at page 173, that was attached to her counterclaim, it also states here manner of death, suicide, right here on the page. The certificate of death that we have in the record doesn't say anything about the manner of death. It does say gunshot wound to the head. I think that is an exhibit that was used at trial, perhaps, that you're holding. I'm looking at exhibit 67, so perhaps you're right. And I'm looking at the attachment to our pleadings. It is arguable that if the medical examiner does not determine the manner of death, that it is either unknown, say, for example, it's unknown. If she had said unknown. Right. Or in the alternative, without having said specifically suicide, that it's the insurance company's burden to prove that their defense is working, and they have to do that by clear and convincing evidence. Is that a correct statement? It would be the burden on the insurance company to show that the suicide provision applies, and it's our position that it would be by a preponderance of the evidence, rather than a clear and convincing standard, and that's based on, and we're going back as these are various cases to 1875 in the Holden case, where it was a direct issue addressed by the court as to a jury instruction, and the court reversed because it should have been a preponderance of the evidence standard. The later case that the trial court relied on, which was the Kettlewell case from 1954, there's a statement in there that suicide must be proved by clear and convincing evidence, but that it wasn't an issue in the case and did not appear to have been proved by the parties. And then on remand in the appellate court, they also apply the preponderance of the evidence standard. Mr. Tickless disappeared on December 17th, 2011? That's right. The body was found on February 2nd. I believe I read in the record that there was some opinion that he, from the medical examiner's testimony, that he'd been dead about two weeks, that would leave from December 17th until mid-January. I don't believe the testimony was that he had been dead for two weeks. I believe that the coroner's opinion that it could have been, you know, he could have died around the time that he disappeared in December. There's no exact moment, but it was, you know, in the winter, and there was some difficulty in pinning down the time of death because of the weather. Okay. If they can call someone, they can get that information. I'm sure it would be better. Thank you. To address that issue. But we believe that it should be reversed, this judgment on just their failure to prove that they even followed within the insuring agreement in the first instance. Did the medical examiner testify or state any documents that are in the record? She testified that the, although it does say suicide in the death certificate that was not admitted into trial. I believe that was sort of a conclusion that she couldn't just state on the record. She said that the proper death was consistent with a self-inflicted gun wound. But she also testified that she couldn't rule out any other possibility. Well, she couldn't rule out certain possibilities. Let's say that he had a heart attack. Or that it was external. Or that it was homicide. Well, she used her, she became an opinion to a degree of reasonable certainty that it was the cause of death was from a self-inflicted gun wound. She couldn't rule out certain things like that there had been some sort of strangulation because there had been some animal activity and some of the organs were gone like the heart. So she couldn't rule out as a scientific matter that he had had a heart attack and somehow that this had been staged. But we're really looking at what are the reasonable conclusions that could be drawn from the evidence here. And on this evidence the only reasonable conclusion that could be drawn was that Mr. Tischler's committed suicide. Well, that's your obvious conclusion that Dr. Aaron Kumar could not rule out a third-party firing a shot. She couldn't rule it out. It's not necessary to rule out every possibility. Let's say she couldn't rule out the possibility at the exact spot where there was a gunshot wound that somebody struck him in the head first and then shot him in the exact same place. Is that a reasonable conclusion to be drawn from all the evidence that we have here? And it's not just the forensic evidence, but it's, you know, putting things into context. And that includes the fact that he was seated on his favorite pillow from his Kenosha lighthouse when we found his body. He left his wallet, his driver's license, and his keys on his nightstand before he disappeared. He had a dire financial situation. He was upside down on numerous loans. He had lost his children's college savings. He had reported negative income on his taxes. He had invested significant assets in a failing business in Antioch that he couldn't get a liquid license for. He was described by family and friends in the weeks leading up to his disappearance as depressed, not the same confident man, different, somebody I didn't know. Also, he owned a handgun, and it was missing from the home at the time of his disappearance. He was also not at the scene of the crime. Is that correct? If you commit a suicide, wouldn't the gun be there? It depends if it was in a public area. If it had been in a locked room somewhere, maybe that would be, you know, a more important question. But here he was found out in a forest preserve. Did they test his hands for gunshot residue? Not to my knowledge. I believe that the officers that came upon the scene considered it more of a death. So isn't it also accurate that the officers who came upon the scene and found the body must have immediately told Mrs. Sickless that it was suicide, that that was their immediate conclusion, because she immediately started to tell people that it was suicide, but she would have had no reason to believe that unless the officers had told her that. I don't know that that's in the record that that's what the officers had told her. She may have had no reason at all to believe that he committed suicide. Weren't there several notes? I'm sorry? Weren't there several notes? There were several notes found, five pages of notes, and these are in the nature of goodbye notes. They're telling, I think it would be some of those, there were a couple. I have it transcribed outside of the hammer. I love my family and friends so much, my Christopher, my Louie, my Nicole, my Kathy, my dad, my mom, my brother, et cetera. All my intentions were to make sure they were on solid ground, but this market just killed me. Antioch was the nail. Georgiatis, I tried to help him. Ralph Brenn, great guy, he said he would try to help, but now I'm hopeless. I should have listened to my dad, et cetera. And there was another note. Never forget this was because I did love you. There was also a note that said, like insurance, referring to his agent, don't think they'll pay. Yes, Your Honor, that was also, I know that was found around the time of his death. Couldn't these notes also be interpreted as somebody who's going to take his $3,000 that he just took out of the bank and disappear, leaving his wife and kids to sort of start a new life? Well, if that's the case, it leads to even more questionable as to whether there was even, you know, why would we need proof of death? There are cases where people just disappear and their family believes them to be deceased, but the insurance company needs some proof before they pay a significant sum of money just based on a phone call. All I'm saying is these notes, I don't believe these notes conclusively prove that he was going to commit suicide. They may indicate that his initial instinct was, I'm going to run. I can't take it anymore. I'm under too much pressure. This is getting me down. I'm taking my $3,000 and going to Canada or whatever, and that something else happened in the meantime. One of the reasons that I think that that could happen is because he clearly loved his family, and everybody says that, not only his words, which he could have just made up, even discounting his words, all the testimonies, he was deeply committed to his family, and so if he was deeply committed to his family, he may have actually planned to just drop off the grid and something else happened. One of the mysteries of this case is he says in his notes there's a man named Tavouris, Tavouris is a snake. Who's Tavouris? Yeah, I believe there's a business associate of his and maybe a friend. I don't really know exactly who this is, but if you're putting these notes in context as sort of a goodbye note, as, you know, I love you, maybe people write notes when they feel depressed and maybe don't, you know, even if they're having suicidal thoughts and carry them out, but you have to put this together with all the evidence and the forensic evidence of him being found in the woods on a pillow with a gunshot wound to his head. What other explanation is there for that? You know, it can't be asked for that, but it's got to be either homicide or suicide, and we're not saying we have to prove homicide. Well, you can't speculate. You have to prove it was your burden to prove. You did not call in a forensic psychologist to examine his life, his history, his notes, the record, blah, blah, blah. You didn't do any of that. It's not required. Well, it would have been helpful to the court. If this is something that would have been helping us speculate, we would have had an expert opinion. If this is something the right person, anybody who would be presented, a reasonable person, presented with this whole big picture, his dire financial situation and the forensic evidence, these notes, it's putting that together that leads to all the one reasonable conclusion. I'm sure that you and I would both agree that Judge Patrick Schrock is a reasonable person. He didn't agree with that. That's at least one person who did not agree that that was the only reasonable conclusion. So you cannot say reasonable people would all agree. Well, we believe he also made some errors in applying, you know, one that we believe he applied the wrong standard approach, that it should have been preponderance rather than clear and convincing. But he also drew some conclusions. I think he was mistaken as to his interpretation of the testimony as to the angle of the gunshot wound so that he had it somehow, you know, right back by his ear when the testimony was, it was only, you know, four inches back on one side, three on the other. So he thought, well, if the gunshot went off, the arm would have somehow gone outward. And he also drew some conclusions of his own about, like, why isn't this jacket blood soaked? You know, when there's no testimony saying that had he been shot in the head, his jacket would be blood soaked as opposed to maybe blood shooting outward and then he, you know, it fell forward. And the other thing was he took judicial notice after the close of evidence of 9 millimeters equaling .354 to sort of rule out the possibility that the gunshot wound could have been caused by a 9-millimeter bullet when there was nothing in the coroner's report to suggest that it had been measured to that degree. Or even, you know, what are the exact measurements of a 9-millimeter bullet? Does that include the casing? It's just, you know, there's judgments and mistakes like that. And why would you object to the trial judge drawing reasonable, say, just as an isolated example, some inference from the lack of blood on the victim's clothing when you want him to draw an inference from the notes? Why are we losing a double standard here about the judge using his own instinct? Well, with things like blood flow, that's something that you can provide a scientific explanation for. The clothing was observed by the court. It was in evidence, as I understand it. Yes, and he finally, no, he wasn't making it up that it didn't appear to be blood soaked, but what he was providing was sort of a factual predicate for that, that, oh, if he was shot in the head, his jacket would be blood soaked. Well, there's no testimony in the record to support that hypothesis that if you're shot in the head, your blood will run down, especially when the body fell forward and the exit wound was to the left, outward. Yeah, he's just sort of assuming in the facts that weren't there. It's different from drawing a conclusion from maybe, you know, what was somebody's state of mind or what do these, you know, somebody's personal expressions of emotion mean in context. And that's the difference with the actual nature of the evidence that would be the size of a bullet wound. And a final issue is on the prejudgment interest. We believe the trial court applied the wrong version of the statute, that it should have applied the version of the statute that was in effect at the time of the death. When the statute was amended, and this was in August 2011, about a year after the policy had been in effect, it especially states it applies to all policies now in force. And under that statute, interest accrues from the latest of the date that the insurer receives proof of death, which we believe he did not, or the date when the insurer receives sufficient information to determine its liability and extent of liability. At the time that Countrywide was notified of Fisher's death, it did not have sufficient information to determine its liability. You know, even if that was proof of death, you know, was it a suicide or was it, you know, an accidental death where he might be entitled to the full policy limits. So at the very least, we believe that portion of the judgment should be vacated. Any other questions? Thank you. Good morning, Your Honor. I'm David Klobad, and I, along with the four counselors, Tim Howell and Laura Perry, represent the plaintiff, Captain Chiklis, who is present here in court. I would like to address our cross-appeal, the condition precedent argument in Country of Life's decision, the issue of interest and our conditioning appeals, and Mr. Howell would like to address the substantive issues of burden of proof against the manifesto rate of the evidence with respect to responding to Country of Life's appeal. Our cross-appeal deals with the issue of bad faith, and the trial court order said that the trial court does not believe the plaintiff is able to state a cause of action upon which she would be entitled to relief. Now, typically, the standard of review for relief to amend is abuse of discretion, and you look at whether or not you should amend under the Loyola statute. The judge said you waited too long. You don't even argue that in your briefs. So you waited that. End of story. We don't have to decide that. That was the basis of the court-made ruling. The court in the motion for reconsideration gave two bases. He said that I think you waited too long and I don't think you stated a cause of action. Okay. But just waiting too long is enough to deny it. Whether you had stated a cause of action or not is irrelevant. The appellate court can obviously make any reason to affirm or deny the trial. But you didn't respond to the argument that it was too late in your brief. So we take that as a gift, it seems to me. You didn't contest that. You raised other issues. That was the issue with respect to the – I raised the Loyola factors in our brief, and I said that we had medical Loyola factors. I didn't get into the details of the four factors. I got into the substance of it. Right. But it's not the substance, to me, that's the most important part. I mean, that's not – substance or not, you still have to get through the first trial, and that is you were too late. Unless you have – the judge should have properly allowed you to amend, then we never get to the issue of the substance effect. So I don't – I think it's a two-step process, and you're going to step two, and you're leaving us – I'm happy to address – No, your brief has been addressed. So I do believe that – I think you should move on. Okay, I'll move on. I certainly don't want to try your patience with respect to that. With respect to the conditional appeal, conditional appeals are interesting. There's not a lot of case law. It's very, very rare. In this case, there's no – again, I don't think it matters that much. If you go back to trial – If you win, it doesn't matter. If you go back to trial, it won't matter. We should give an idea to the – on retrials, what would happen, or give an idea to other cases out there, what the ruling should have been on those evidentiary people. It prevents the bouncing back of 4A. And in this instance, there's two really quick points with respect to the conditional appeal, and you only really get to them if you believe that it was at that point. But what the conditional appeal brought out was a really curious thing, and that was we had argued that that instant subpoena that the trial issued during trial on the proper police department was unfair and prejudicial. But in response, country law said, wait a second, we didn't put into evidence in terms of the record on appeal any of those exhibits, so you can't argue that. And we went back in terms of preparation, and they didn't put any of those exhibits. They didn't put the notes. They didn't put in the shell casing. They didn't put in the jacket. They didn't put in the pill bottles. They didn't put in the liquor bottle. So now we have this interesting conundrum of, all right, well, if we can't argue it in terms of a conditional appeal because it's not part of the record of appeal, then this court should disregard their citations and readings of the notes and other evidence that's not part of the record of appeal. The conditional appeal, again, is something that's extremely, extremely rare. And I don't think you've made the case as to why this case is one of those rare instances where we're actually making advisory decisions. It would not be an advisory decision if the court were to consider, if you're going to weigh the evidence and you're going to re-weigh the evidence to determine was it against the manifest way, if you make the determination that maybe it is or isn't, it would only be then that you would consider whether these factors should be added to the scales or taken off the scales. And that's the only instance. If there's no inclination to re-weigh, then I'm not going to waste your time discussing the conditional appeal. I'm not saying there isn't. Well, then, we'll take a moment to discuss why the best evidence rule in terms of Exhibit 20 should not have been let into evidence. What about the facts? You're talking about the facts? I'm talking about the copy of the facts. It wasn't even an original. And the witness identified that the duplicate was housed at the Park Ridge Police Department. He couldn't identify what the facts numbers were. He didn't know if he personally got it. He didn't know why the pages were different. So you have only a dish. He couldn't identify why there were potentially two different handwritings on the notes. And because they didn't establish that it was a duplicate of an original and that the original was unavailable, it should not have been admitted over the best evidence rule objection. With respect to the other objection that the judge gave us a standing objection to in terms of the subpoena during trial bringing in all this physical evidence that we didn't have an opportunity to examine, we just need to only point to a DVD that the police department had that was post-dated John Schicklis' disappearance that we couldn't view. We couldn't have our consulting expert, a retired police officer, look at any of the evidence. We were completely ambushed by it. With respect to conditions precedent, I'm really befuddled by Country Life's argument that the beneficiary has to provide a death certificate when, in fact, they had a death certificate. Let's go back. The whole case rests on this, in my opinion. Unless you can win this argument, you lose your case. So let's talk about that. They didn't say, first of all, it doesn't have to be the beneficiary. It could have been the agent. It could have been anybody. Correct. Correct. So don't say you had to be asking the beneficiary. They asked the agent. They had no way to give them anything. The fact is somebody has to give them proof. Now, you agree that Barbara Dirks of Country Life was told by the insurance agency manager, Jeff Orman, who was told by the insurance agent, Bill S. McCarpolis, so far you agree, who returned word of John's death from a phone call from Katherine that John, and this is a quote, blew his brains out. Now, did I say anything incorrect there? Yes. Well, actually, my client called Bill S. McCarpolis' wife, who then told Bill, who then told the agent. I did. I said that. I'm sorry. I didn't get you to say the wife. You said she told Bill. No, no, no. Who returned word of John's death from a phone call, Bill, learned of John's death on a phone call from Katherine. No, Katherine called his wife.  Bill's wife. Bill's wife, correct. Yes. Okay. That's correct. Bill's wife. Good job. Okay. Right. So when we have hearsay and hearsay and hearsay. Then hold up and quit. Notice of claim is notice of claim. Okay. Thank you. You just lost the case. Because you said it's notice of claim. It's not notice of claim. It's proof of claim. Death. It's not notice. So if that's your position, you can't possibly win. So, you know, there are two things within the insurance claim. There's notice and then there's proof. Okay. Notice starts the claim process. There's no contention in this case that Country Life had notice on it. I just said it's proof of correct. So they had proof of death no later than yesterday. They never received proof of death from anyone. They got it themselves. That was not their burden. That was after they filed the lawsuit. Come on. If this is the way insurance companies operate, this first way, it's not what the state law says. It's not what the case law says. If you have it this way, this will turn insurance companies upside down. Because all that somebody has to do is call and say, my husband is dead. That's not what it says. Do proof. All over the country. I read the cases. All over the country. It's uniform what that means. And it has to end up in a court of law. And that kind of notice, here's safe on his sake, on his sake, does not end up in a court of law. So I don't understand. You know, the judge really explained his reason. He kind of goes over that. You're exaggerating. The word suicide doesn't even appear. And in your brief, your opening brief, too, the idea of do proof or death is hardly discussed. Hardly discussed. So there's very little that you have provided us on this key issue. You've talked about everything else. So I'm trying to give you an opportunity to say how, under Illinois law, and Illinois law provides, do proof shall consist of sufficient evidence to establish in a court a prima facie case for payment of the claim. So, Your Honor, I think you're confusing two different concepts. Notice and do proof. Once notice is given to the insurance company, they have a duty to investigate. And in this instance, they still need do proof. Yes, Your Honor. They have do proof. No, no, no. What is do proof? The certified copy of the death certificate they attached. No. That is not do proof. That's not their burden. No, no, no. They can file a lawsuit. So give me one case that says what? I'm asking a question. Yeah. Give me a case. So any of the cases dealing with proof of death of a prima facie case would be proved at trial, correct? So we could prove at trial that John Chiklis was dead. It didn't matter when they had copy. That wasn't proof. Do proof is one of the requirements in order for you to begin this process. It's not notice. The words, yeah, you have to find out about it. You have to tell them. But it also says, do proof shall consist of sufficient evidence established in a court a prima facie case for payment of the claim. You never gave them it. So they had do proof of claim on June 13, 2013. Five years ago they had do proof of claim. No. They did not have it. They had a copy to their affirmative defense. That is not from you. You had the burden. The law is very clear who has the burden. So you want to transfer the burden. At trial, the claims adjuster, Barb Dirks, admitted that a copy of the death certificate was do proof of the claim. And she never received it. She, country life, received it. That is not. She is not. They don't have that burden. Okay, so in this instance. Out of my law, it's pretty clear. And other cases throughout the country that have been covered in the out of my law have not gone there with regard to what an insurance company has to do. I mean, tell me a case where out of my law, an insurance company has that burden. I can certainly submit something a little briefer. No. You had the opportunity to do that. Inside any cases. Because in this instance it's admitted fact that they had do proof.  They never. Yes. Yes, I'm sorry. Barb Dirks, in her testimony at trial, admitted that she had do proof that the certified copy of the insurance policy was do proof. And that the certified copy of the insurance policy was attached to the pleading the trial court. Okay, so the proof that was given was suicide. No, I'm sorry, Your Honor. The proof that was given was proof of death. Not do proof of death. You're trying to transfer the burden. I'm not going to. You show them where the burden can be transferred. So with respect to when the trial court determined on this, is that he read the policy and he said that it's upon receipt, the insurance company's receipt of do proof of death. It doesn't say in the policy that the beneficiary has to provide that. It doesn't say who has to provide it. It doesn't say. The beneficiary, the agent, anyone on it ever provided it. No, no, they did provide it. Well, that's where we're different because you had shown me a case that says that do proof was your lawsuit. No, do proof was the insurance, the certificate of death, which, by the way, is a public document. Which talks about self-inflicted wound. Yes. Okay, so it's a suicide. No. That's why a self-inflicted wound. That's what, for me, that's what that's going to. My cooperation in the discovery. What was going on here is why they received a phone call that said it was a suicide. That's all they knew. And they kept trying to get information for a year. So, Your Honor, when there's a claim filed, they have a duty to investigate under Illinois law. Every insurance company is the same. When your house burns down and you call them up and you say my house burns down, they have to investigate the claim. What they did in terms of the investigation of this claim, like any other insurance claim, was they asked their own agent to investigate. He didn't. They asked the beneficiary, who is under no duty to provide them anything, to investigate their claim for them. If nobody has any information, they have to go to the beneficiary. If they don't, if the beneficiary, somebody's in that burden. It isn't the insurance company. What the insurance code says, the insurance code requires, when there is a claim on a policy due to the death of the insured, then settlement shall be made upon receipt of proof, due proof of death. Receipt. Your Honor, take that word out. They never received any due proof of death. I know I've already read to you and counsel has stated with it. They did receive the death certificate on June 13, 2013. It doesn't say receipt. It doesn't say who has to provide it. And when you want to do it, you write a receipt. Who would be receiving it yourself? They receive it from the state of Illinois. It's a public document. You can go down to anywhere in the world and file a document. The case law, proper country right now, has said that's not the duty. That's not a duty of an insurance company to go out and get that information. So, Your Honor, if they had written an MOU to give us a case. So, I'm sorry. In Wiggum, in the case that was cited by the country right, there was a specific set of rules that the beneficiary had to follow. They had to file a proof of claim. They had to file a proof of death. We don't have that situation. We don't have it. They didn't put that burden on the policy. They just had that they didn't have it. No, sir. This burden was already in the policy because of the words, due proof of death. That's what's in the policy. We're always interpreting words in policies. Yes, and with respect to country preferendum, if there's any ambiguity in the policy, then it has to be construed against the insurance company. That's correct. In this particular policy, it doesn't say one way or another who has to provide it. Only that the insurance company received it. And the facts of the case as found by the trial court was they did receive it. They did have proof. And it would also be quite ironic to take the position that Mr. Chickles died by suicide, but we don't know if he's dead or not. They have a duty to investigate. And they didn't investigate this claim. They tried to put that duty off onto the beneficiary. The beneficiary could have been a discovered barista in Paris, France, who had no more ability or not. They could have written it into the insurance policy. They didn't do that. You're absolutely right. I agree with that. Thank you, Your Honor. With respect to the interest application, if I may move on, are there any other questions dealing with the interest policy? The cases that were cited by counsel, the neighbor case, dealt with a period of time when the interest was I want to tell you Federal versus Midland Casualty Company. They converted it in favor of the insurer, where only oral notice of the insurer's death was provided, and there was no proof of death. I think the case is distinguishable that here we do have I'm sorry, I don't have this. Thank you. I have the Wigman case. I don't care about Wigman. Wigman is just like the Federer, which is why I was confused. I'm asking about Federer. In Federer, the policy had specific Wigman is an appellate court case. Federer has an oral notice hearing court case. The company in the case in Federer said that the company the policy specifically said the company upon receipt of such notice were furnished with such forms they were furnished it for filing of loss. If such forms are not furnished within 15 days, etc., etc., a firm proof of loss must be furnished to the company in its office. So here they had no action in law that would be brought until you filed the proof of loss. So here, these are all the times of 1925. So insurance companies have known since 1925 that if they wanted the beneficiary to follow certain procedures certain rules, they had to put in good policy. They did. And the words, do proof, words have been in policy for over 100 years. Over 100 years. It started in the late turn of the century. The policy in this instance, the words do proof are not capitalized. They're defined. They don't have to be. There are a ton of words, as you know, that have been loaded. So, Your Honor, if I understand your position correctly so I can address it, and I don't mean to be confrontational. No, no, that's all right. You're saying that do proof, we see that do proof means that the beneficiary has to provide it. I didn't say that. Somebody has to provide information. So somebody in this case did provide the information. No. What they did is they had a copy that they got after you filed a loss. That's not the same thing. So after we filed a lawsuit, somebody went to the Cook County Department that's in charge of death certificates, and as a public citizen, they filled out a form, they ordered, and they got it. They're always publicly available. If that wasn't law, then there wouldn't need to be proof of death certificates. Your argument is the insurance company has a burden to go to the county clerk's office and get that certificate. If we agree with you, that would be the law in Illinois, correct? Yes. Otherwise, that's not correct. So the facts in this case are, as you believe that the insurance company does have a burden to investigate. That's not what I said. Yes, the question has to do with getting that death certificate. That's all I said, right? So you're saying that the law in Illinois is the insurance company has the burden to go get the death certificate. Is that your position? No. My position is, is that in this case, it didn't matter who had to get the death certificate because they got it. No. So they'll take care of it themselves. What difference does it make who gets it? That's what I'm asking. So the law in Illinois is that it doesn't matter who gets it. Correct. That's the law in Illinois, correct? We have no cases to say that. I didn't say any cases does that. I don't know that there are any cases that correctly say that the beneficiary has the burden to go get it. It's the Asian person. There's lots of people that could have done something. But you want the law in Illinois to turn it on its head and turn insurance companies into total investigators. Once somebody makes a phone call that says somebody's dead, then you're saying it's up to the insurance company to go out and investigate and do everything else. There aren't any cases that say that in Illinois. None have any cases around the country that say that because of this due proof of death. Okay. So I don't think that we need to reach that issue with respect to any change or modification of Illinois law because the facts in this case are they had due proof of death and they admitted it. So in that instance, we don't have to reach any discussion about whose burden it was or wasn't. They had it. It's a moot point. The facts of the case are they had the death certificate, and they had to process that claim based upon receiving due proof of death. So they can wait now, so they can wait until a lawsuit is filed against them, and then when they get a copy of it, that's sufficient. That's the law you want. Well, no. The law that I don't need any change in the law, Your Honor. The law is that they have to pay upon receipt of due proof. They had received due proof. We don't have to get into the issue of how they got it, when they got it, whether it was by mail or someone slipped it under their door, or whether Bill Asikamopoulos got it or whether the beneficiary got it or some third party gave it to them. It doesn't matter who gives it to them as long as they have it, and they had it. I'd like to move on to the interest issue, if I may. The interest rates in Illinois have changed a number of times with respect to prejudgment interest. It's typically in the trial court's determination of whether or not to grant prejudgment interest, and that is not overturned unless it's against the manifest way to the evidence. But there's a statute here. The statute says it applies to policies left in place at the time the policy was entered. We have a new statute that doesn't apply it. Why didn't they apply it? And so the answer to that question is because the statute says that it applies to policies issued and delivered in Illinois. And with respect to a termline policy, you have a termline policy that was issued in 2010, two years prior to this change in the law. And this was not just a change in the interest rate. The question wasn't when. It was in effect at the time. Policy was in effect during that time. The way the statute's worded made it ethical at that time for policies in effect. It says policies issued or delivered with respect to the interest rate. Yes. So it also had an issue. The policy had an issue. It was the statute says, you're right. It's issued or delivered in the state unless this policy contains in substance the following provisions. So the statutory language is attempting to make the determination retroactive. And a policy, a change in the law is not retroactive to an existing contract if it impairs that contract. So under the prudential Scott standard, the question is, did this change in the statute impair John Schiffler's existing insurance contract? The previous case decided it dealt with only changes in the rate of interest. The cases that are on this point have all stated that the statute in effect at the time of the insurer's death are the ones that are appropriate. The statute simply applies to all policies now enforced. Okay, so the difference between those cases is a very shallow interpretation of what the statute changed. At that time, the statute only changed the interest rate, 5 to 6, 8 to what, 8 to 9. So they're only looking at a change in the rate. This statute is a very different animal than those other statutes. This statute not only changes the rate, but it provides insurance companies safe harbor against payment. And those safe harbor payments say that now the new law is we don't have to pay unless and until we figure out who the beneficiary is. We don't have to pay interest even when the policy says that we'll pay interest from date of death. We get to toll that until our claim is adjudicated if we have a defense. Or we don't have to pay that unless the estates or other issues in contention are settled. So this change in the law, which came apart changing a much broader statute, speaks to the insurance company's lobby to get new safe harbors. But make no mistake, this is a substantive change in the law. Under this statute, what country law is asserting is that we don't have to pay any interest because we have a lawsuit trying to determine the amount of our liability. So therefore, there's no prejudgment interest. So they're trying to apply a statute retroactively. It would impair Ms. Chiklis' rights. So impairment of contract, they say, oh, it doesn't impair our rights. But insurance companies never argue for a retroactive application of law. It's amazing that they're arguing here, but they're arguing it because it benefits them. Did you cite any cases finding a retroactive application of interest statute impairs contractual rights and obligations? No. I cited Scott, which talks about a retroactive application of impairment of a substantive right because unlike the other cases that dealt only with interest, this deals with something much more than that. Under their application, Ms. Chiklis would get nothing. And so the court disfavors the constitutional rights against impairment of contract, don't permit an amendment of an existing contract. There's also another reason, a pretty basic reason, why this statute, the new statute, wouldn't apply. There's a notice provision in it. They were required to give Ms. Chiklis notice of this statute. And you set aside the carve-out for term policies, so they specifically seem to address the fact that they know under term policies that they would be impairing the contract. There's a notice requirement. Did you make that argument, please? Yes. So with respect to the term policies, the term policy carve-out of the provision, it says notwithstanding the foregoing, it doesn't apply to term policies. And the reason is that the policy was started in 2010. So, again, I'm sorry, I confused myself. But getting back to the point about the lack of notice, so because they failed to even comply with the terms of the new statute, it affords them no satisfaction here. They would, at best, owe interest at 10% instead of 9%. But we don't believe that this interest rate should apply. I believe I've run out of my time. I wanted to allow Mr. Howe to come and address the substantive issues of the two minutes. Sure. Thank you. Good morning, Your Honors. Tim Howe on behalf of Katherine Chiklis in this case. There's been a lot of talk about what group proof is. And I'll touch on that for just a moment. But you can't go over it. We've already heard his argument. That's a double theme. I understand. Very well. I'll move on. In the end here, what's important to know is that Judge Sherlock got it right in his findings in favor of Ms. Chiklis. There were a lot of objections throughout this trial to this introduction of state-of-mind evidence, including these lay observations, as has been pointed out, which went from initially distraught but not suicidal until someone told these people, like Bill Asimakopoulos and people like that, oh, I heard Bill killed himself. Oh, well, John killed himself. Oh, well, I guess, maybe. But at the time he went missing, none of them, none of them, thought that his moves were such that he would be seen as suicidal. These notes, they were vague. They lacked sufficient foundation as to when they were written, where they were found. In some cases, they weren't even included in the record. Judge Sherlock weighed all evidence, took into account its deficiencies, and found a country that could not meet its burden. Now let's talk about these notes. Number 16, which was also number 78, it was in the record, okay, provided in the record as an exhibit, but it was never admitted. What was admitted was the original number 78. That's not in the record, and yet they argue it. Number 18, one of the other notes, with some of the language in Greek that was discussed in testimony, but never admitted or put into the record on appeal. Number 20, of course, is this one with the facts, two different versions of one page and another page where it clearly appears that it was started and stopped. No one knows where these notes were specifically found. No one knows when they were written. No one knows anything about these notes sufficient to actually get them into evidence. Nevertheless, Judge Sherlock did consider them and then dismissed them when weighing his evidence to determine that they were not evidence because there was nothing to tie them to Jonathan's appearance and certainly nothing to tie them to his death. It's important to remember that from the very beginning, Bill Asimakopoulos, who was a country life agent and employee there, was told that Bill died before that. He had had conversations with John. He said, yeah, he was distraught, but I never thought in a million years he was suicidal, in a sense. In fact, after he disappeared, Greg Checkless, John's brother, came to him and said, hey, I just read the story. Do you think John could have? He said, absolutely not. No way. John would never have killed himself. But that's, again, as an aside, Bill Asimakopoulos never had any doubt that John was dead, his best friend in the whole world, an employee and agent of country life. He knew. He knew that John was dead. There were a couple of instances in Council for Country Life that I do want to correct. There was a reference to a favorite pillow. That was subject to a motion in Women Aid order. That was barred. There was testimony from one witness, Mr. Georgiotis, who snuck it in. We objected at the time. It was subject to a motion in Women Aid order. It shouldn't have never come out. We do object. We objected to that entire line during Mr. Georgiotis' testimony. I believe that we did, Judge. I don't believe. You're saying you did? We objected at the start of the questioning to where I was going. Now, whether that encompassed those specific words, I thought at the trial that it was clear that we were objecting to the entire line. The opinion from the medical examiner as to suicide was actually of an agreed motion in Women Aid. This is why you see the redactions in many of the certificates, many of the documents. It was agreed that without an expert on suicide, they could not call suicide a trial. And both parties agreed to that. That wasn't contested. Country Life agreed to that. The medical examiner testified that John could have died as late as early January. That was her testimony on cross-examination. Additionally, it was talked about the angle of the bullet and whether or not Judge Sherlock could take that into account. As I was examining Dr. Erin Kamar, I pointed in and I pointed out. She confirmed that. I made the exact same motions during closing argument. They are consistent with Judge Sherlock's interpretation of that. The certified record of death was certified on February 10, 2012, according to Exhibit No. 67. So, if you take a look over, and once again, there is really no doubt here that Country Life knew through its agent, Bill Osimakopoulos, that Mr. Schicklis was dead. There is no question about that. We want to go over it. I'd like to. We can do that again. I agree with you. It's fine. So, we have none of the notes really are in the record as admitted. The fact that someone is distraught at a particular time in their life, there is no basis for saying that that person is more or less likely to commit suicide. That's what Country Life wanted the court to jump to. That people who have struggles in their life are necessarily suicidal. In a sense, what they brought here was a race-IPSA defense, but that's contrary to the burden. The burden in Kettlewell, as we refer to it, Kettlewell II, the Supreme Court case, Kettlewell is quite clear as to what the insurance company's burden is in invoking a contestability or an exclusion under suicide in a life insurance policy. It is clear and convincing evidence. Courts which have visited this that are not precedential have confirmed that. The sole death case in federal court. There's a state farm case as well. Both quote from Kettlewell and indicate that it is in fact and remains, as late as the 1980s, the law of the land in the state of Illinois. Judge Sherlock, in colloquy, indicated that whether he agrees with it or not, frankly, whether this court agrees with it or not, the Supreme Court of Illinois has spoken with clarity that the burden for the insurance company is clear and convincing evidence. They didn't present it. I don't think, in looking at this, that they even presented preponderance of evidence. Dr. Erin Kamar couldn't testify with any certainty as to what caused John's death. She acknowledged that the bullet wound that she observed in the autopsy would have been fatal if he were alive. She also acknowledged that he could have been strangled. She could not say that he wasn't. There was a piece of skull missing, not at the entry point as counsel indicated, on the other side. There was an entire piece of skull that was missing. Her testimony was that he absolutely could have suffered a blow to that area of the brain and skull. There's no way she could determine that. It is rife with a lack of evidence as to how Mr. Chickas actually died. So from a medical scientific standpoint itself, there's no way that you could determine by any standard that it was even this gunshot wound that was the cause of death, only that it would have caused death immediately had he been alive at the time. The death scene, as reported by Detective Anderson, there was no blood whatsoever at the death scene. Dr. Erin Kamar reported it. Was it in the police reports? Were the police reports an evidence? It was in his testimony. Detective Anderson said there was no evidence of any blood. He was asked if there was any blood on the scene. He said none. Not on the tree, not on the pillow, not on the jacket, not on the ground, not on the leaves. The question was, and I'll paraphrase, the question was, did you find any blood at the scene? And his answer essentially was no. They searched a 20 by 20 foot area for a bullet that was fired under John's head at the scene. They couldn't find a bullet. They couldn't find a gun. And they were perfectly okay with the fact that somebody walked off with a handgun in Cook County and no idea what it was. And the best they could do was go ask one homeless guy in an encampment some distance away, hey, did you take a gun? Do you know anything about this? This was not a homicide investigation, was it? It was never a homicide investigation. They made up their mind, and if you look at Detective Anderson's testimony, he determined from the very beginning that this was Mr. Chickas walking off at some point and doing harm to himself. And they never considered anything else. It's not Mrs. Chickas' job to investigate how her husband died. It's not. That's for the police or for the insurance company if they're going to invoke a suicide contestability clause. They have the burden to investigate. The police department has a burden. The medical examiner has a burden. Every single one of these people that has actual burdens dropped the ball. This thing was rife with failures by the police department. Detective Anderson, can I talk to you for a second? You were here for 15 minutes. I apologize. I get on a roll sometimes. At the end, I just want to bring up, and you said it was no brief, but Justice Bristow in the Cadillac case talking about the trial court that sees in here as much that we cannot see in here. We know there are things that cannot be preserved and are shown by the written page of the Bill of Exceptions. Judge Strzok was there. He heard the testimony from Bob Burks. He heard the testimony from Bill Passamakopoulos. He heard the testimony from Detective Anderson. He heard the testimony from Dr. Aaron Kamar. He heard all of these other witnesses testify. And taking it all into totality, weighing that evidence as only the trier of fact can, he came to the reasonable conclusion that country life did, in fact, have the due proof that was necessary. This wasn't a case of a missing body. In a couple of the cases, the body was never found. Someone slipped in the water. I'm summarizing, Judge Strzok. Don't go there. I apologize. That there was no evidence, no evidence, admissible evidence that John killed himself. There was evidence that he was dead. There was evidence, in fact, no dispute. There was evidence that he had suffered a gunshot wound to his head. No one could testify that it was self-inflicted. In fact, the parties agreed in a motion in Limine, an agreed motion in Limine, that there would be no reference to any testimony that was self-inflicted because there was no one competent to offer that testimony. There was no evidence that he was suicidal. There were notes that indicated that sometime over the last several months, he, like many other commercial real estate individuals in 2011, was struggling financially because of the market. We didn't have a rain of real estate brokers down on LaSalle Street. Lots of people are. We know more and more about mental illness, about depression, and we know that it doesn't equal suicide. And for that reason, Judge Sherlock rightly dismissed that because there just wasn't enough there. There wasn't enough there to convince him that John was suicidal. There wasn't enough there because there was no way to tie the writing of the notes to when he disappeared. If they were written two months earlier, three months earlier, four months earlier, or one of the notes was written on the back of a flyer from May of 2011, perhaps he had bad thoughts then, but the testimony from people who were there said, yes, he was upset, he was not suicidal. In the days prior to his disappearance, he was actually in good spirits. So, again, the weight of the evidence was clear that country life did not meet their burden. Certainly not by clear and convincing standards, and frankly, in any review of this, not by preponderance either. But the standard is obviously clear and convincing. I don't think there could be any question about that. Country life had notice as early as... Wait, wait, no, I'm just going to... They still would have paid. They still would have paid even the debt that you would have repaid, the premiums. They know he's dead. That's... But it remains a shame because... I don't like to talk to you. I apologize once again. So, as I say, there's no indication that the bullet used was from a gun that was owned by Mr. Chiklis. They couldn't find a bullet. They couldn't find a gun. There's just nothing there. There's nothing there. There's no explanation as to why there isn't blood there. Again, not our burden, their burden, to explain why there's no evidence. I can see I've exceeded my time. I apologize, and I thank you for your assistance. Thank you. If the court has no further questions, we will just stand on our feet for any remaining issues, and we ask that you vacate and reverse the judgment from January 2017. That brings it in favor of plaintiff and the judgment in favor of country life. Thank you. Do you want to make a few points at that point? Counsel, you better make it fast. I'm sorry? You better make it fast. She hasn't raised any points. She hasn't raised any points. You can't finish what she started to say, and that was her rebuttal. She's standing on her feet. I understand. I'm sorry. I'd like to make a few points if you... I'm so sorry. Thank you. Okay. Thank you for your excellent arguments and your excellent briefs. We appreciate the time that you've taken on this. We will give it a lot of consideration. In the meantime, this briefcase is taken under advice that the court has adjourned. Thank you.